**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAMAR DAWSON,
　　　　　*Plaintiff-Appellant*,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION; PAC-12
CONFERENCE,
　　　　　*Defendants-Appellees*.

No. 17-15973

D.C. No.
3:16-cv-05487-RS

OPINION

Appeal from the United States District Court
for the Northern District of California
Richard Seeborg, District Judge, Presiding

Argued and Submitted October 15, 2018
San Francisco, California

Filed August 12, 2019

Before: Sidney R. Thomas, Chief Judge, Andrew J.
Kleinfeld, Circuit Judge, and George H. Wu,[*]
District Judge.

Opinion by Chief Judge Thomas

---

[*] The Honorable George H. Wu, United States District Judge for the
Central District of California, sitting by designation.

## SUMMARY[**]

### Labor Law

The panel affirmed the district court's dismissal of a Division I college football player's claim that he was an employee of the National Collegiate Athletic Association and the PAC-12 Conference within the meaning of the Fair Labor Standards Act and California labor law and thus entitled to minimum wage and overtime pay.

The panel held that Division I football players were not employees of the NCAA or PAC-12 as a matter of federal law because the economic reality of the relationship between the NCAA/PAC-12 and student-athletes did not reflect an employment relationship. The panel concluded that NCAA regulations providing a limitation on scholarships did not create any expectation of compensation; plaintiff could not demonstrate that the NCAA or the PAC-12 had the power to fire or hire him; and there was no evidence that the NCAA rules were conceived or carried out to evade the law. Further, the revenue generated by college sports did not convert the relationship between student-athletes and the NCAA into an employment relationship. Thus, the NCAA and Pac-12 were regulatory bodies, not employers of student-athletes under the Fair Labor Standards Act.

The panel also affirmed the district court's dismissal for failure to state a claim of plaintiff's California law claims. The panel held that the district court properly relied on a

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

legislative exception for student-athletes from workers compensation benefits and the California courts' interpretation of this exception. The panel held that, under the California Labor Code, student-athletes were not employees of the NCAA/PAC-12.

---

## COUNSEL

Mark C. Rifkin (argued) and Jeffrey G. Smith, Wolf Haldenstein Adler Freeman & Hertz LLP, New York, New York; Betsy C. Manifold, Wolf Haldenstein Adler Freeman & Hertz LLP, San Diego, California; John M. Kelson, The Law Offices of John M. Kelson, Oakland, California; Jerry K. Cimmet, San Mateo, California; for Plaintiff-Appellant.

Daniel S. Volchok (argued) and David M. Lehn, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.; Kenneth D. Sulzer, Steven B. Katz, and Sarah Kroll-Rosenbaum, Constangy Brooks Smith & Prophete LLP, Los Angeles, California; for Defendant-Appellee National Collegiate Athletic Association.

Kiran A. Seldon (argued), Jeffrey A. Berman, and Diana Tabacopoulos, Seyfarth Shaw LLP, Los Angeles, California, for Defendant-Appellee PAC-12 Conference.

**OPINION**

THOMAS, Chief Judge:

We consider whether Lamar Dawson and Division I Football Bowl Subdivision ("FBS") Football Players are employees of the National Collegiate Athletic Association ("NCAA") and PAC-12 Conference ("PAC-12") within the meaning of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, and California labor law. We have jurisdiction pursuant to 28 U.S.C. § 1291. Because the claims fail as a matter of law, we affirm the judgment of the district court.

I

Dawson played football for the University of Southern California ("USC"), a Division I FBS member of the NCAA's PAC-12 Conference. In this putative class action case, Dawson does not allege that he was an employee of USC, so the pure question of employment is not before us, and we need not consider whether he had employment status as a football player, nor whether USC was an employer. That question is left, if at all, for another day. Rather, the only issue before us is whether the NCAA and PAC-12 were his employers under federal and state law.

The NCAA is an "unincorporated not-for-profit educational organization" comprised of more than 1,100 colleges and universities throughout the United States. NCAA member schools are organized into three Divisions based on the number and quality of opportunities that the schools provide to participate in intercollegiate athletics. Division I consists of approximately 351 schools.

Approximately 253 Division I schools have Division I football programs, of which approximately 128 fall within the FBS. The PAC-12 is an unincorporated association which operates a multi-sport collegiate athletic conference, and is a formal conference member of the NCAA Division I FBS.

NCAA member schools "agree to administer their athletics programs in accordance with the constitution, bylaws, and other legislation of the [NCAA]." The NCAA's constitution and bylaws establish academic eligibility requirements, provide guidelines and restrictions for recruitment, impose limits on the number and size of athletic scholarships, and regulate the scheduling and conditions of practice and games.

The NCAA bylaws also govern financial aid and prohibit compensation for student-athletes. Bylaw 15.1 provides that student-athletes may receive financial aid on the basis of athletic ability, but that the amount of aid must not exceed "the value of his or her cost of attendance." Student-athletes receiving aid in excess of the cost of attendance limitation "shall not be eligible to participate in intercollegiate athletics."

NCAA Bylaw 12.1.4 provides that financial aid is "not considered to be pay or the promise of pay for athletics skill." Bylaw 12.1.2 further prohibits any payment to a student-athlete for athletic services. Student-athletes who accept payments may be subject to revocation of their amateur status and eligibility under seven conditions.[1]

---

[1] Bylaw 12.1.2 revokes amateur status and NCAA eligibility where a student-athlete: (1) "[u]ses his or her athletics skill (directly or indirectly) for pay in any form in that sport;" (2) "[a]ccepts a promise of

In his complaint, Dawson alleged that the NCAA and the PAC-12 acted as an employer of the class members by "prescribing the terms and conditions under which student-athletes perform services." Dawson claims that the NCAA and PAC-12, as joint employers, failed to pay wages, including overtime pay, to Dawson and to class members in violation of federal and state labor laws.

The NCAA and the PAC-12 moved to dismiss Dawson's complaint for failure to state a claim upon which relief can be granted. The district court granted the motion, and dismissed the complaint without leave to amend.

II

The district court properly concluded that Division I FBS Football Players are not employees of the NCAA or PAC-12 as a matter of federal law.[2]

---

pay even if such pay is to be received following completion of intercollegiate athletics participation;" (3) "[s]igns a contract or commitment of any kind to play professional athletics, regardless of its legal enforceability or any consideration received, except as permitted in Bylaw 12.2.5.1;" (4) "[r]eceives directly or indirectly, a salary, reimbursement of expenses, or any other form of financial assistance from a professional sports organization based on athletics skill or participation, except as permitted by NCAA rules and regulations;" (5) "[c]ompetes on any professional athletics team per Bylaw 12.02.11, even if no pay or remuneration for expenses was received, except as permitted in Bylaw 12.2.3.2.1;" (6) "[a]fter initial full-time collegiate enrollment, enters into a professional draft (see Bylaw 12.2.4);" or 7) "[e]nters into an agreement with an agent."

[2] The district court below based its decision primarily on the Seventh Circuit's opinion in *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285 (7th Cir. 2016). *See Dawson v. Nat'l Collegiate Athletic Ass'n*, 250

A

The FLSA provides that "employers" must pay their "employees" a minimum wage and overtime pay for hours worked in excess of the statutory workweek. 29 U.S.C. §§ 206(a), 207(a)(1). The statute defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). To "employ" means "to suffer or permit to work." 29 U.S.C. § 203(g).

The FLSA definition of employee is "exceedingly broad," but "does have its limits." *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985). "An individual may work for a covered enterprise and nevertheless not be an 'employee.'" *Id*. at 299. For example, an individual "who, 'without any express or implied compensation agreement, might work for their own advantage on the premises of another'" falls outside the FLSA definition of employee. *Id*. at 300 (quoting *Walling v. Portland Terminal Co*., 330 U.S. 148, 150 (1947)).

Ultimately, "[t]he test of employment under the [FLSA] is one of 'economic reality.'" *Id*. at 301 (quoting *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33 (1961)). Economic reality accounts for "the circumstances of the whole activity" rather than considering "isolated factors" determinative. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947).

The Supreme Court has found a number of circumstances relevant in evaluating economic reality, including: (1)

F. Supp. 3d 401, 403 (N.D. Cal. 2017). We do not adopt *Berger*'s analytical premises nor its rationales.

expectation of compensation, *Portland Terminal*, 330 U.S. at 152; (2) the power to hire and fire, *Goldberg*, 366 U.S. at 33; (3) and evidence that an arrangement was "conceived or carried out" to evade the law, *Portland Terminal*, 330 U.S. at 153. We apply these guiding principles in our analysis, and conclude that the economic reality of the relationship between the NCAA/PAC-12 and student-athletes does not reflect an employment relationship.

1

We need not address whether Dawson's scholarship engendered an "expectation of compensation" or whether his scholarship amounted to compensation because he did not receive the scholarship from the NCAA or the PAC-12. The NCAA Bylaws reveal that member schools themselves award and distribute the financial aid Dawson alleges constitutes expected compensation. *See* 2015–16 NCAA Division I Manual, NCAA Bylaw 15.01.6 (prohibiting "institutions" from awarding aid to a student-athlete in excess of cost of attendance).

Dawson's theory is that NCAA regulations prohibit NCAA student-athletes from accepting compensation beyond scholarships limited to cost of attendance. He does not claim that the defendants provide scholarships; whether "compensation" or not, scholarship funding comes from his school. The limitation on scholarships does not, as a matter of law, create any expectation of compensation from the NCAA/PAC-12.

Thus, on the undisputed facts, neither the NCAA nor PAC-12 provided Dawson with a scholarship or any expectation of a scholarship.

2

Similarly, on this record, Dawson cannot demonstrate that the NCAA or the PAC-12 had the power to fire or hire him. Dawson alleges that the NCAA/PAC-12 assert complete control over the lives of student-athletes, on and off campus, including a student-athlete's: "(a) living arrangements; (b) athletic eligibility; (c) permissible compensation; (d) allowable behavior; (e) academic performance; (f) use of alcohol and drugs; and (g) gambling." Dawson alleges that the penalties for violating these rules include "loss of financial aid and eligibility for sports." Dawson also alleges that the NCAA/PAC-12 control and regulate student-athletes' "training and game schedules, academic schedules, and other collegiate activities."

The NCAA Bylaws pervasively regulate college athletics. The complaint, however, does not allege that the NCAA/PAC-12 "hire and fire," or exercise any other analogous control, over student-athletes. The complaint does not allege, and moreover, the record does not demonstrate, that the NCAA and PAC-12 choose the players on any Division I football team, nor that they engage in the actual supervision of the players' performance. Rather, the allegations of the complaint, taken as true, demonstrate that the NCAA functions as a regulator, and that the NCAA member schools, for whom the student-athletes allegedly render services, enforce regulations.

In sum, on this record, Dawson cannot demonstrate that the NCAA or the PAC-12 had the power to fire or hire him.

3

Finally, there is no evidence tendered by Dawson that the NCAA rules were "conceived or carried out" to evade the law. The relevant rules were first promulgated in the early 1920's, and some version of them has "existed for a long time." *Hale v. State of Ariz.*, 993 F.2d 1387, 1398 (9th Cir. 1993). In contrast, Congress enacted the FLSA in 1938. *Rutherford*, 331 U.S. at 723. Even though "economic reality" in college sports is much different today, there is no evidence on this record that the NCAA rules were "conceived or carried out" to evade the law.

4

The Supreme Court has also considered more specific factors when helpful to probe the economic reality of a particular situation. *See, e.g.*, *Rutherford*, 331 U.S. at 730 (considering whether an employment relationship existed versus independent contractor status); *Goldberg*, 366 U.S. at 32–33 (evaluating whether members of a cooperative may also be employees of the same). In this context, Dawson argues that the labor of student-athletes generates substantial revenue for the NCAA and PAC-12, and that this "economic reality" alters the analysis.

However, precedent demonstrates that revenue does not automatically engender or foreclose the existence of an employment relationship under the FLSA. The Supreme Court has held self-proclaimed volunteers to be employees of a nonprofit religious organization. *Alamo*, 471 U.S. at 296–97. Conversely, we recently held that cosmetology students were not employees entitled to minimum wage despite the fact that they performed services for paying

customers at salons run by their schools. *Benjamin v. B&H Education, Inc.*, 877 F.3d 1139, 1148 (9th Cir. 2017). Therefore, in the context of our preceding analysis, the revenue generated by college sports does not unilaterally convert the relationship between student-athletes and the NCAA into an employment relationship.

B

*Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985), does not compel a contrary conclusion, as Dawson contends. In *Bonnette*, we applied a four-factor test to probe the economic reality of the relationship between state agencies and chore workers hired to perform in-home care for disabled public service recipients. *Id.* at 1470.

The *Bonnette* factors ask "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id*. at 1470. These factors prove "'particularly appropriate where (as in *Bonnette* itself) it is clear that some entity is an 'employer' and the question is which one." *Hale*, 993 F.2d at 1394 (quoting *Vanskike v. Peters*, 974 F.2d 806, 809 (7th Cir. 1992)). Under the *Bonnette* test, however, the NCAA and PAC-12 are clearly not Dawson's employers. They do not admit him to the school or pick him for the team; they cannot remove him from the team; they do not supervise his schedules or activities in practices or games; they do not maintain his scholastic records; and, although they put caps

on what he may receive as a scholarship, they do not determine whether he gets a scholarship or in what amount.

Similarly, *Benjamin* does not alter our conclusion. In *Benjamin*, we applied a seven-factor "primary beneficiary test" to evaluate economic reality in the vocational student-employee context. 877 F.3d at 1147. The primary beneficiary test looks to "seven non-exhaustive factors for courts to weigh and balance[.]" *Id*. at 1146 (discussing *Glatt v. Fox Searchlight Pictures, Inc.*, 791 F.3d 376 (2d Cir. 2015), *amended and superseded by* 811 F.3d 528 (2d Cir. 2016)).[3]

---

[3] The seven factors applied in *Benjamin* were:

> 1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.

> 2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.

> 3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

> 4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

> 5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

*Benjamin* is not useful in determining whether an employment relationship exists between Dawson and the defendants. *Benjamin* involved vocational students earning academic credit necessary to take a state licensing exam. *Id.* at 1142. In contrast, student-athletes are participating in highly regulated extra-curricular activities. Thus, *Benjamin*'s "primary beneficiary test" fails to "capture the true nature" of the relationship at issue here. *Hale*, 993 F.2d at 1394.

## C

In sum, the district court correctly held that the NCAA and the PAC-12 were not Dawson's employers. Within the analytical framework established by the Supreme Court, the NCAA and PAC-12 are regulatory bodies, not employers of student-athletes under the FLSA. *Cf. Berger*, 843 F.3d 285 (affirming dismissal for failure to state a claim on former athletes' claims against their schools because the athletes were not employees within the meaning of the FLSA). The district court properly dismissed the FLSA claims.

---

6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.

*Id*.

III

The district court also correctly dismissed Dawson's California law claims for failure to state a claim, relying on the California Legislature's decision to except student-athletes from workers compensation benefits and decisions of the California Courts of Appeal that interpret the student-athlete exception. Dawson argues that the district court erred in dismissing his state law claims because the exception does not apply to the wage and hour provisions at issue here.

The status of student-athletes under California labor law has a storied history. In 1963, the California Court of Appeal determined that the estate of a state college football player, killed with his team in a plane crash while returning from a football game, was entitled to death benefits from his college under the state's Workmen's Compensation Act. *Van Horn v. Indus. Acc. Comm'n*, 219 Cal. App. 2d 457, 465 (1963). The California Legislature responded in 1965 by amending the Workmen's Compensation Act to exclude explicitly "'[a]ny person, other than a regular employee, participating in sports or athletics who receives no compensation for such participation other than the use of athletic equipment, uniforms, transportation, travel, meals, lodgings, or other expenses incidental thereto.'" *Graczyk v. Workers' Comp. Appeals Bd.*, 184 Cal. App. 3d 997, 1005 (1986). The amendment intended to "clarify the position" of athletic sponsors, and noted the "absence of the usual elements of the employment relationship." *Id.* (citation omitted). The Legislature again amended the Act in 1981 to "more specifically clarify the exclusion of athletic participants." *Id.*

To be sure, the exclusion of student-athletes from the Workmen's Compensation Act at Section 3352(k) of the

Labor Code is informed by Section 3350, which provides that "[u]nless context otherwise requires, the definitions set forth in this article shall govern the construction and meaning of the terms and phrases used in this division." Cal. Labor Code § 3350. Dawson emphasizes the Legislature's use of the phrase "this division," and argues that *expressio unius est exclusio alterius*—the expression of one thing excludes the expression of another—"confirms that Section 3352(k) is confined" to the Worker's Compensation section of the Labor Code. However, California's appellate courts have interpreted the Legislature's actions differently.

In *Townsend v. State of California*, 191 Cal. App. 3d 1530 (1987), Division Two of California's Second District Court of Appeal held that a student-athlete who committed a tort on another student-athlete during a basketball game was not an employee of his state university, barring the tort victim from recovering under a theory of respondeat superior. While the case concerned the California Tort Claims Act, not worker's compensation, the court discussed *Van Horn* and the Legislature's responsive amendment to the labor code. *Townsend*, 191 Cal. App. 3d at 1535–37. The *Townsend* court determined that "the amendment of Labor Code section 3352 . . . evidenced an intent on the part of the Legislature to prevent the student-athlete from being considered an employee of an educational institution for any purpose which could result in financial liability on the part of the university." *Id*. at 1537.

Fifteen years later, Division Five of the Second District Court of Appeal determined that a former women's basketball player could not state a claim against a private university and its women's basketball coach for violation of the California Fair Employment and Housing Act because she was not an

employee of her university. *Shephard v. Loyola Marymount Univ.*, 102 Cal. App. 4th 837, 842–44 (2002). The court restated and elaborated on *Townsend*'s broad characterization of the student-athlete exception, describing "the Legislature's clear intent. . . . to exclude a student-athlete from the definition of employee." *Id*. at 844 (discussing *Townsend*, 191 Cal. App. 3d at 1535–37). To hold that the student-athlete was an employee under the FEHA, the court determined, would "specifically eschew the application of Labor Code section 3352, subdivision (k)." *Id*. at 846.

Dawson argues that reliance on *Townsend* and *Shephard* is misplaced because the cases concerned statutes not at issue here. However, the Courts of Appeal in those cases determined that the Legislature intended that the student-athlete exception extend beyond the Workmen's Compensation Act. *Townsend*, 191 Cal. App. 3d at 1537; *Shephard*, 102 Cal. App. 4th at 844. Even if the California Courts of Appeal had not explicitly outlined the Legislature's intent and the broad applicability of the student-athlete exception, the California courts' willingness to apply the exception outside of the worker's compensation context contradict Dawson's threshold argument that the exception applies narrowly.

Furthermore, other actions of the California Legislature support that the student-athlete falls outside of California labor law. Specifically, in 2012, the California Legislature enacted a Student Athlete Bill of Rights. Cal. Educ. Code §§ 67450–67453. The statute's findings recognized that student-athletes "spend approximately 40 hours per week participating in their respective sports" and that their efforts "generate large revenues." Cal. Educ. Code § 67450(c). The Education Code then recognized that student-athletes may

incur "medical expenses incurred from injuries suffered while participating in intercollegiate athletics." Cal. Educ. Code § 67450(e). Instead of extending employment-related protections to student-athletes, however, the Legislature provided for scholarship compensation and the payment of insurance deductibles and medical expenses for injured students, the availability of financial and life skills workshops, and due process protections for student-athletes involved in disciplinary actions facing loss of athletic scholarship funds. Cal. Educ. Code §§ 67452 (a)(1), (b), (c); 67453(a).

Thus, under California law, student-athletes are generally deemed not to be employees of their schools. Cal. Labor Code § 3350(k); *Graczyk*, 184 Cal. App. 3d at 1005; *Townsend*, 191 Cal. App. 3d at 1537; *Shephard*, 102 Cal. App. 4th at 842–44; *see* Cal. Educ. Code §§ 67450–67453. There is no authority that supports an inference that, even though the student-athletes are not considered to be employees of their schools under California law, the NCAA and the PAC-12 can nevertheless be held to be "joint employers" with the students' schools. Consequently, we must hold that student-athletes are not employees of the NCAA/PAC-12 under the California Labor Code.

IV

For the foregoing reasons, we affirm the district court's dismissal of Dawson's FLSA and California state law claims against the NCAA and PAC-12. We need not, and do not, reach any other issue urged by the parties, nor do we express

an opinion about student-athletes' employment status in any other context.

**AFFIRMED.**